UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
MILFORD GANGADEEN, RONALD BROW, SHARON  :
HALLOWAY, and AKINDRA REAPE,            :
                     Plaintiffs,        :        07 Civ. 10965 (DLC)
                                        :
             -v-                        :        OPINION & ORDER
                                        :
THE CITY OF NEW YORK, NEW YORK CITY     :
DEPARTMENT OF HEALTH & MENTAL HYGIENE,  :
THOMAS R. FRIEDEN, SARAH BEATRICE,      :
THOMAS J. BREUERS, and MEYER, SUOZZI,   :
ENGLISH & KLEIN, P.C.,                  :
                     Defendants.        :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
Walker G. Harman, Jr.
The Harman Firm, P.C.
19 Fulton Street, Suite 408
New York, NY 10038

For Defendants:
Michael Cardozo
Corporation Counsel of the City of New York
Of Counsel: Isaac Klepfish
100 Church Street, Room 2-171
New York, NY 10007


DENISE COTE, District Judge:

     Plaintiffs Milford Gangadeen, Akindra Reape, and Sharon

Halloway[1] bring suit alleging that defendants[2] violated 42 U.S.C.

---

[1] Plaintiff Ronald Brow was dismissed from this action by Order
dated January 30, 2009.  Brow's motion to object and appeal was
denied by Order dated April 1, 2009.

[2] Plaintiffs' dismissed their claims against defendant Meyer,
Suozzi, English & Klein, P.C. with prejudice by stipulation

§ 1983 and the First Amendment, New York State Civil Service Law Section 75-b, and the New York City Human Rights Laws.[3] Following the completion of discovery, defendants moved for summary judgment on plaintiffs' claims, and the motion became fully submitted on July 10, 2009.  For the following reasons, the motion to dismiss the First Amendment retaliation claims is granted, and the Court declines to exercise jurisdiction over the remaining state law claims.  See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003).


BACKGROUND

     The following facts are undisputed, unless they are identified as being advanced by either the plaintiffs or defendants.  Plaintiffs Gangadeen, Reape, and Holloway were employed by the New York City Department of Health and Mental Hygiene ("DOHMH") as Special Officers ("SOs").[4]  The Bureau of the Public Health Laboratory ("BPHL") is a licensed and

---

filed March 6, 2008.  Defendants Sara Beatrice and Thomas Breuers were never served with a summons and complaint in this action, and thus the only defendants in this case are the City of New York, the Department of Health and Mental Hygiene ("DOHMH"), and its Commissioner, Thomas Frieden, collectively referred to as "defendants."

[3] Plaintiff Reape also alleges that she was discriminated against on the basis of disability in violation of New York State Executive Law Section 296 and New York City Administrative Code Section 8-502(a).

[4] Holloway remains employed as a Special Officer with DOHMH.

regulated laboratory located in the DOHMH building on First Avenue in New York City.  DOHMH's Public Health Laboratory ("PHL") is a testing and analysis location for potential specimens of biological weapons of mass destruction.  Numerous inspections and reviews have found the BPHL in substantial regulatory compliance, and its license has been continuously renewed.

SOs employed by DOHMH are often assigned to security posts at the DOHMH building on First Avenue, including to the intake post at the PHL.  The SOs are supervised by Thomas Breuers, the Director of Security for DOHMH.  The SOs are designated peace officers under New York Criminal Procedure law, and their duties include monitoring the safety of the DOHMH premises.  According to DOHMH Police Force Patrol Procedures, an SO must "[o]bserve any unusual conditions including fire and safety hazards; where possible, correct the situations and report all such conditions."  As for the requirement in that manual that "Health police shall immediately notify their supervisors of any serious incident or condition," Breuers testified that this refers to the notification of criminal activities.

Dr. Sara T. Beatrice is the Director of the PHL.  Beatrice does not supervise or manage non-BPHL employees who are assigned to the DOHMH building, such as the SOs.  It is the role of the Health and Safety Unit of the BPHL to insure the safety of BPHL

3

employees.   The director of the BPHL Health and Safety Unit is Jacqueline Terlonge, who reports to Beatrice.

BPHL monitors the air in New York City to test for the presence of agents of bio-terrorism, and it conducts tests on substances brought by various other agencies to determine if the substances are hazardous.   Federal regulations provide a protocol for the handling of suspected bioterrorism samples brought to the BPHL.

Machines known as autoclaves are used to decontaminate samples sent to BPHL after testing.   The autoclaves are not located in areas to which the public has access.   After going through the autoclave, the samples -- contained in red bags labeled with a biohazard insignia -- are removed and placed in carts to be picked up by a medical waste carter.   After samples have been autoclaved, there may be an offensive odor.

In response to an April 22, 2005 memorandum from SOs to their union delegate Al Soto, expressing the SOs' complaint that odors emitted from the autoclave had caused dizziness and nausea, DOHMH conducted an air quality test on May 17, 2005. The test found that the air quality was satisfactory with no contaminants, but recommendations were made to reduce the odor emanating from the autoclave.   A subsequent test performed on August 21, 2008 confirmed that the air quality was at acceptable levels.

BPHL also conducts weekly surface testing of the specimen intake area in the building; all such testing has revealed no select agent contamination in the intake area.  On February 21, 2006, the BPHL tested samples from the residence and workplace of a drummer who had become ill with symptoms of anthrax poisoning.  Dr. Heller, the person responsible for the BPHL Select Agent Program, reported that no breaches occurred in the integrity of the samples, but plaintiff Gangadeen states that FBI agents went to their vehicles and opened the samples, potentially exposing everyone there to anthrax spores, and failed to re-decontaminate the submissions in violation of the laboratory's Standard Operating Procedure Manual.  No employee of BPHL, including Dr. Heller, reported any issue related to the laboratory's handling of the anthrax samples.  Gangadeen alleges that he was exposed to anthrax and treated months later for a rash with an antibiotic, but he did not complain about the handling of the samples to anyone at BPHL and has provided no evidence to corroborate his receipt of this medical treatment.[5] Gangadeen admits that he did not submit a line of duty injury request or otherwise report to Breuers or his staff that he had

---

[5] The New York City Health Code requires numerous individuals, including physicians, to report suspected cases of anthrax to DOHMH.  No reports were made to DOHMH in connection with Gangadeen's allegations of being treated with an antibiotic.

been exposed to anthrax.  Indeed, Gangadeen made a log entry on February 23, 2006 that all accessioning protocols relating to the anthrax were followed, stating: "All accessioning protocol was followed as per Dr. Heller's instructions.  Nothing further to report."

SOs assigned to the intake area do not wear protective gear, because they do not handle specimens or open bags that are presented to the BPHL for testing.  Specimens are removed from their protective packaging by BPHL technologists in a secure laboratory, and SOs are not in that laboratory or involved in the unpacking, testing, or transporting of specimens.

Breuers testified that SOs were trained in connection with the "accession" process, which was a method of maintaining and documenting the legal chain of custody of specimens submitted for testing that involved numbering and entering the specimens in a database; Reape, however, states that SOs were not so trained.  Defendants have produced an email from the intake coordinator stating that "Officer Reape was trained in receiving BW samples.  Next time PO REAPE [works] this location she should do the sample intake and have someone watch over her."

A.  The Plaintiffs' Employment History

Halloway

Halloway was hired by DOHMH in April 2001, and was transferred to PHL following September 11, 2001.  In 2004, Halloway requested a transfer from the PHL, but did not specify a particular facility or assignment to which she wished to be transferred.  In a letter dated September 30, 2004, she was offered a transfer to a field assignment, but she declined the offer because of the easier commute by public transpiration to the PHL building.  Halloway did not make any additional requests for a transfer.[6]

By memorandum dated May 22, 2007, Halloway was transferred due to circumstances surrounding her arrest of a PHL employee. Halloway remains employed by DOHMH.

Gangadeen

Gangadeen was hired as an SO on April 1, 2001.  He was disciplined and placed on probation in 2006, and resigned in 2007 in lieu of being fired.

---

[6] Although Halloway did not dispute the 56.1 statement that she never again requested a transfer following her rejection of the field assignment offered to her in September 2004, she asserts in a declaration without further detail or explanation that DOHMH denied her "numerous" requests for a transfer and "forced" her to continue working in hazardous and toxic conditions at the PHL building despite her asthma.

In a notice dated April 18, 2006, Gangadeen was suspended by the Employment Law Unit ("ELU").  In the related Notice and Statement of Charges dated April 21, 2006, the ELU described that Gangadeen had, inter alia, repeatedly said "fuck you" to his supervisor and had threatened him by saying "you don't know me -- watch your back."[7]  After an Informal Conference was held on April 27 relating to this incident, the Informal Conference leader recommended the termination of Gangadeen's employment, but Gangadeen entered into a stipulation on May 19, 2006 with ELU settling the charges.  The stipulation provided that, inter alia, Gangadeen would be suspended without pay for 30 days, and be placed on probation for one year from his return.

On May 14, 2007, Breuers received a threatening email from an unknown person from a "willselfdistruct" website, which he reported to the New York City Department of Investigation ("DOI").  Breuers notified Jonathan Wangle in the ELU and Inspector General Christopher Staackmann that he had received an email containing a threatening message.  Investigator Stephan Zander of the DOI commenced an investigation.  In investigating this incident, Wangle notified the DOHMH Information Security Officer of the email, who retrieved DOHMH police officer Cecilio Gonzalez's computer activity and data.  This information

---

[7] On two earlier occasions, in 2003 and 2005, Gangadeen was reported using loud and abusive language and behaving inappropriately.

revealed "numerous e-mail communications between Gonzalez and Gangadeen that contained sensitive and confidential DOHMH information."

Zander issued a report on June 12, 2007 to the ELU, summarizing his findings, based on, inter alia, a May 17, 2007 interview with Gangadeen under oath.[8]  Zander reported that Gangadeen had admitted that he took unauthorized pictures of the laboratory, that the pictures were sensitive in nature, and that he shared the pictures with Gonzalez.[9]  Gangadeen also admitted that www.willselfdestruct.com emails had been sent by Gonzalez to Breuers, Frieden, and others, and that Gonzalez had bragged that he used that website so that the emails could not be traced.[10]  Gangadeen asserted in the interview that he took these photographs of health and safety violations and emailed them to his supervisor.  Gangadeen also stated in his interview that he and others should be eligible for hazardous material pay.  In Zander's report, he notes that "[a]lthough Gangadeen's concerns for safety conditions within the Health Lab may be sincere, his conduct appears to have violated the terms and conditions of his

---

[8] Zander's findings were again issued in a December 10, 2007 closing memorandum.

[9] In an interview DOI conducted with Gonzalez the following day, May 18, Gonzalez also admitted under oath that "DOHMH policy prohibited the taking of pictures within the Health Laboratory."

[10] In his 56.1 counter-statement, however, Gangadeen "[a]dmit[s]" defendants' statement that Gangadeen himself sent these emails.

City employment" due to his videotaping sensitive areas and violating the DOHMH computer policy by emailing still pictures from the videotapes to another officer.  Zander concluded that the matter should be referred to ELU for discipline.

Gangadeen admits that he learned of this investigation and the fact that charges would be filed against him by June 1, 2007, and on July 9, 2007, ELU served Gangadeen with a Notice of Statement and Charges ("Notice") charging him with acts of misconduct stemming from his taking pictures at PHL and for excessive lateness and unauthorized absences in 2006 and 2007. The Notice was sent by Rose Tessler of the ELU, and was based on the DOI's findings.  The Notice stated that Gangadeen had violated Standard of Conduct Rule 3.25, "Conduct prejudicial to good order and discipline."  It informed Gangadeen that he had

> [a]dmitted to the [DOI] using your personal video
> camera to record images inside the [PHL] in or about
> November of 2006.  As a Special Officer assigned to
> the [PHL], you are aware that any form of recording,
> including video or photography, is prohibited inside
> the facility.
>        Additionally, it is part of your duties as a
> [SO] to prevent any individual attempting to make
> such a recording of the facility or items contained
> therein.

The Notice also advised Gangadeen that he had violated that Conduct Rule and one regarding unauthorized use of City equipment on or about May 9, 2007, by using his DOHMH email and/or computer to send 70 digital images of items inside the

PHL.   The Notice also charged that Gangadeen had improperly used a DOHMH fax machine, and had violated another conduct rule by being absent and late for work without authorization on several occasions in 2006 and 2007.

After an Informal Conference was held on August 7, 2007 relating to these charges, the Informal Conference leader recommended termination of Gangadeen's employment, and a hearing was scheduled for December 13, 2007.   On that day, Gangadeen, represented by counsel, executed a stipulation with DOHMH, signed by himself and his counsel,[11] in which he resigned as a SO.   The stipulation stated that Gangadeen "hereby agrees and states that he has entered into this Stipulation knowingly, intentionally and voluntarily without coercion or duress, and upon advice of his counsel, and does accept all of the terms and conditions contained herein."   Gangadeen states that DOHMH took the position that he would be fired unless he resigned, so "instead of having a termination on [his] employment record, [he] felt [he] had no choice but to resign."   The stipulation provides that if outside employers inquire about Gangadeen's employment, DOHMH will not disclose the nature of the underlying disciplinary proceedings.   Gangadeen's resignation was effective as of January 30, 2008.   While still employed in December 2007,

---

[11] Gangadeen's counsel in connection with the December 13, 2007 stipulation is the same as in the instant action.

DOHMH granted Gangadeen's transfer request to a facility in the Bronx so that he could visit his daughter more easily.

Reape

Reape was hired as a probationary SO on April 23, 2007. From May through October 2007, Reape was late on ten occasions, and she was given counseling letters by her supervisors. Additionally, she was coded as being absent without authorization six times between August and October 2007. Despite these time entries, Reape states that she has never been absent without authorization.

On October 31, 2007, Reape submitted a DOHMH Reportable Occurrence Form which claimed that she had become ill due to an insect bite while on duty at PHL on October 6, 2007. On October 26, Reape provided DOHMH with a doctor's note stating that she "has left parotid gland inflammation and she needs to stay away from infectious environment at workplace." Reape was approved for medical leave, but because she did not have any available sick or annual leave balances, she was placed on a three month medical leave without pay. Reape maintained this status from November through February 3, 2008, with an expected return date of February 4, 2008.

Reape sought an extension of that leave, stating that her doctor did not approve her return to work. The Assistant

Commissioner of the DOHMH's Bureau of Human Resources, Brenda McIntyre, states that Reape did not submit updated medical documentation to support this request.  Reape claims that she did not want to go on leave, but wanted a transfer to a different location, but that while on leave she submitted medical documentation from her physician stating that she was not authorized to return to work, and that she was "approved for further leave by Dr. Gehl's office, a.k.a. Employee's Health." Reape states that she was eventually diagnosed with an autoimmune disorder that her doctors believe was caused by the hazardous environment in the laboratory, and that she provided a doctor's note to that effect in November 2007, but she has provided no documentary or other evidence on this score.  On February 4, 2008, Reape did not return to work, but instead requested additional leave with pay.  She also requested leave under the Family Medical Leave Act and pursuant to the DOHMH Time and Leave Manual, but it was determined she was ineligible.

When Reape did not appear for work on February 4, 2008, she was considered Absent Without Official Leave ("AWOL").  Reape claims that she had submitted "all necessary medical documentation" and had been approved for further leave by Dr. Gehl, but has provided no additional evidence of any such approval or additional documentation beyond the doctor's note of October 2007 related to her gland inflammation.  On March 7,

2008, a letter from McIntyre advised Reape that Reape's services
as an SO were no longer required.  It is undisputed that at the
time McIntyre advised Reape that her employment was terminated,
McIntyre was not aware that Reape had made any allegations of
health and safety violations.


B.  Episodes of the Plaintiffs' Speech

Halloway

     1) Halloway and Gangadeen (and several other SOs) signed a
letter to Union Delegate Al Soto, on April 22, 2005, stating:

> We, the officers of The Public Health Laboratories
> have made several complaints regarding the exposure
> to chemical exhaust from the second floor
> autoclaves.  We continue to maintain this post 24
> hours a day, seven days a week under hazardous
> conditions.  These autoclaves tend to emit odiferous
> particles and emissions that are both offensive and
> hazardous.  We often feel sick and the fumes are
> retained in our clothing and hair thus coming home
> with us to subject our families to the same hazards.
> A similar exposure resulted in a hospital admission
> two years ago.  We should not have to work under
> these conditions.  Several complaints have been made
> and no change has yet to occur.  **Please help!**
> Thank you in advance for your consideration and
> effort to resolve this issue.

(First emphasis supplied).  Soto submitted this memorandum to
Breuers's staff.

     2) Halloway wrote a memorandum to Terlonge, dated September
22, 2003, regarding the "9th Floor Post," stating the following:

> I am writing to you on behalf of several staff
> members and myself who are exposed to [h]azardous

> conditions on the 9[th] floor post and should be
> relieved from exposure to the chemical infectious
> agents and the pollutants.  Due to the Autoclave in
> use everyday and the elevator shaft construction
> work which sends off smoke and heavy dust particles,
> I am requesting air testing on the 9[th] floor because
> myself and others have a hard time breathing or
> keeping our eyes open.

Also Halloway asserts that she made verbal complaints to many

people, including her supervisors, union representative,

Terlonge, and the doctors and scientists analyzing the

materials.

    3) Halloway's supervisor filled out a Health Police Crime

and Incident Report, dated February 5, 2005, in which he wrote:

> Reporting officer [Halloway] stated a foul odor on
> the 2[nd] fl.  The officer was feeling noshes [sic]
> and dizziness.  I and Sgt. Bradley both responded to
> the 2[nd] fl.  Sgt. Bradley stated that there was a
> strong odor and also was feeling dizzy.  P.O.
> H[a]lloway was removed to another location.  I and
> Sgt. Bradley notice[d] that the smell was coming
> from hazardous red bins by the freight elevators.
> Their [sic] was 6 hazardous red bins.  Sgt. and
> [indecipherable] did not get medical attention.

Gangadeen

    1) Gangadeen signed the April 22, 2005 letter to Soto

described above.

    2) On August 23, 2005, Gangadeen wrote to U.S. Senator

Hillary Clinton's office about "Concerns regarding NYCDOHMH

Police."  He wrote that he was writing the letter "with great

concern as an employee."  The letter states, inter alia, that

"we as a Police unit is understaffed and under equipped," and

that "[w]e have been involved in HAZMAT situations and we are

not trained nor receive compensation for it.  We don't even have

gas masks like the ones strapped around NYPD. . . .  Our work

location has been updated for security purposes, but we have

not."  The same letter was also faxed to U.S. Senator Charles

Schumer's office.

3) Gangadeen asserts that he wrote to Breuers on January 4,

2007, to advise him of breaches involving the intake of

biohazardous materials.

4) On April 19, 2007, Beatrice received an email from "P.O.

M Gangadeen, DOHMH Police," regarding "Bio-watch/Intake,"

stating that "there are many issues to address regarding the

intake area."  This was the first and only written communication

Beatrice ever received from Gangadeen.  The email did not

mention any issues relating to the anthrax samples brought to

the laboratory in February of 2006.  Beatrice states that the

email did not identify any violations of health and safety

regulations, but Gangadeen asserts that it identified breaches

of intake protocols in violation of the Code of Federal

Regulations and the Laboratory Operating Procedure Manual.

The email set forth a "[l]ist of problems," including: that

personal protective equipment ("PPE") located in the

decontamination room should be disposed of, that papers in the

decontamination room are later taken and stored thereby
"widen[ing] the area of contamination," that there should be a
red bio-hazmat bin in the decontamination room, that there
should be a fax machine in the intake area so that paperwork
does not leave the intake area "in case it has been
contaminated," a request to see whether sections on a form that
must be filled out manually could be filled out on the computer
instead so that all areas could be filled out legibly, that
"[i]ntake refresher courses" should be given at least three
times a year after completion of the initial intake training,
and that while officers have been fitted for respirators and gas
masks they should be trained to put the equipment on in the
proper amount of time.

    Beatrice had Dr. Rodger Silletti, the Director of the
Microbiology Division, which included the Bio Threat Response
Laboratory, review the issues raised in Gangadeen's email.  Dr.
Silletti agreed to revise and supplement the intake procedures,
including recommending relocating the PPE from the
decontamination room, issuing instructions to relocate the sign-
in books, deciding to store cardboard biohazard boxes in the
decontamination room, placing a fax machine in the intake area,
and agreeing to do periodic retraining, including procedures for
donning gas masks and respirators.  Beatrice never advised any
of Gangadeen's supervisors to take any disciplinary action in

connection with the April 19, 2007 email or take any action with respect to Gangadeen's employment.

5) On May 8, 2007, Gangadeen emailed Commissioner Frieden. The email stated that Gangadeen had

> repeatedly addressed breach of protocol procedures receiving negative results[, m]any of which are a hazard and in violation to the CFR. . . .  As an employee . . . my health is at risk due to these breech [sic] of protocol issues.  I love my job and what my job involves, but when my safety is at risk and all the officers at this location are presented with the same problem; its [sic] scary.  As a law enforcement unit we are undertrained, yet implemented in emergency protocols that are fraudulent and excessively fabricated. . . . I am requesting permission from you or your office to send you documents that are relevant to these matters. . . . Due to my complaints I have been blackballed and treated unfairly.  My terms of employment has [sic] been compromised, and I am receiving verbal threats from my superiors.  I fear for my safety based on the severity of this matter, and sometimes jokingly I have been told to watch my surroundings. . . .  Please understand that I would not be wasting your time if I did not have the documents to prove this. . . ."

6) Gangadeen asserts that he emailed Breuers on June 26, 2007, regarding the anthrax incident that took place in February 2006.

7) Gangadeen asserts that he wrote Breuers on July 6, 2007, regarding health and safety violations.[12]

---

[12] Gangadeen's declaration in opposition to this motion briefly refers to a few additional complaints, but he has provided insufficient detail about the dates and substance of the complaints to allow them to be addressed.

Reape

1) Reape asserts that she verbally complained, beginning on April 26, 2007 (three days after being hired), to her supervisors about her "complete lack of training needed to work as an officer in the [PHL]."

2) Reape asserts that she wrote to a supervisor in August 2007, complaining that she had not received proper training and felt this was putting her health and the health of others in jeopardy, but she has provided no copy of this complaint.

3) In September 2007, Reape requested a transfer to another location for "several reasons 1 being healthwise [sic]."  This request did not raise any issues concerning public health and safety.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d
Cir. 2006).  When the moving party has asserted facts showing
that the non-movant's claims cannot be sustained, the opposing
party must "set forth specific facts showing that there is a
genuine issue for trial," and cannot rest on the "mere
allegations or denials" contained in the pleadings.  Fed. R.
Civ. P. 56(e); accord Sista, 445 F.3d at 169.  That is, the
nonmoving party "must do more than simply show that there is
some metaphysical doubt as to the material facts."  Matsushita
Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986).  Only disputes over material facts -- facts that might
affect the outcome of the suit under the governing law -- will
properly preclude the entry of summary judgment.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).


A.   First Amendment Retaliation

     Whether speech made by a public employee is protected from
retaliation under the First Amendment entails two inquiries:
"(1) whether the employee spoke as a citizen on a matter of
public concern and, if so, (2) whether the relevant government
entity had an adequate justification for treating the employee
differently from any other member of the general public."
Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)
(citation omitted).  This standard has also been stated as a

20

three-prong test, requiring plaintiffs to prove: "(1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." Id. (citation omitted).  The first prong in this test actually has two related sub-parts: a) the public employee must be speaking as a "citizen," and b) the speech must be on a matter of "public concern." See id. at 189.

1.  Speaking as a "Citizen" and not a Public Employee

In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421.  Thus, the Court found a memorandum written by an assistant district attorney questioning a search warrant was not protected speech "because that is part of what he, as a calendar deputy, was employed to do." Id.  The Court stated that

> Ceballos did not act as a citizen when he went about
> conducting his daily professional activities, such
> as supervising attorneys, investigating charges, and
> preparing filings.  In the same way he did not speak
> as a citizen by writing a memo that addressed the
> proper disposition of a pending criminal case.  When

21

> he went to work and performed the tasks he was paid
> to perform, Ceballos acted as a government employee.

Id. at 422; see also Ruotolo, 514 F.3d at 189 (noting that it was undisputed that a memorandum prepared at the direction of supervisors was part of plaintiff's official duties). The Court contrasted the memorandum with "the expressions made by the speaker in Pickering[ v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563 (1968)], whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day." Garcetti, 547 U.S. at 422.  The Court also explained that the fact "Ceballos expressed his views inside his office, rather than publicly, is not dispositive," because "[e]mployees in some cases may receive First Amendment protection for expressions made at work."  Id. at 420.  In addition, that "[t]he memo concerned the subject matter of Ceballos' employment" was also "nondispositive," because "[t]he First Amendment protects some expressions related to the speaker's job."  Id. at 421.  Rather, the "controlling factor" was that Ceballos's "expressions were made pursuant to his duties as a calendar deputy."  Id. Finally, the Court noted that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor

sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 424-25.

### 2. Speaking on a Matter of Public Concern

"Whether speech is a matter of public concern is a question of law that is determined by the content, form and context of a given statement, as revealed by the whole record." Singh v. City of New York, 524 F.3d 361, 372 (2d Cir. 2008) (citation omitted).  A public employee's speech "is not a matter of public concern when it 'cannot be fairly considered as relating to any matter of political, social, or other concern to the community.'" Id. (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).

"The heart of the matter is whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." Ruotolo, 514 F.3d at 189 (citation omitted); see also Singh, 524 F.3d at 372.  "[R]etaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'" Ruotolo, 514 F.3d at 190 (quoting Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991)).

Applying these standards, the Second Circuit has found the following involved issues of public concern: "misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it," safety of the workplace and union activities, and the administration of juvenile detention facilities.  Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (citation omitted), overruled on other grounds, Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008). In Munafo v. Metropolitan Transp. Authority, 285 F.3d 201 (2d Cir. 2002), the court described as "border[ing] on the frivolous," id. at 212, the refusal to accept that complaints about "trackworkers' being forced to operate in unlawful proximity to live rails without protective gear, welders' being forced to work without respirators, and drivers' being assigned vehicles with faulty brakes," were on issues of public concern. Id.  The court noted that "[i]f one needed to consult more than common sense, one would need look no farther than the existence of laws such as the Occupational Safety and Health Act of 1970, and similar state laws to recognize that safety in the workplace is a matter of public concern." Id. (citation omitted).

In addition, the fact that a public employee has some personal interest in the subject of the speech does not disqualify the speech from being on a matter of public concern. "Mixed motivations are involved in most actions we perform every

24

day; we will not hold plaintiffs to herculean standards of
purity of thought and speech." Johnson v. Ganim, 342 F.3d 105,
114 (2d Cir. 2003); see also Reuland v. Hynes, 460 F.3d 409, 416
(2d Cir. 2006).


3. Adverse Employment Action

"In the context of a First Amendment retaliation claim,
. . . only retaliatory conduct that would deter a similarly
situated individual of ordinary firmness from exercising his or
her constitutional rights constitutes an adverse action."
Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d
Cir. 2006) (citation omitted).[13]  Such adverse employment actions
in the First Amendment retaliation context include "discharge,
refusal to hire, refusal to promote, demotion, reduction in pay,
and reprimand." Id. at 226 (citation omitted). "This list of
retaliatory conduct is certainly not exhaustive, however, and
lesser actions may also be considered adverse employment
actions." Id. (citation omitted). "Likewise, the institution
of disciplinary proceedings is sufficient in this circuit to

---

[13] The court in Zelnik made clear that the test in this context
focuses on a person of ordinary firmness, and not on "material
adverse changes" in the plaintiff's employment. Zelnik, 464
F.3d at 227; see also id. ("This Court has never held that a
public employee plaintiff alleging retaliation in violation of
the First Amendment must demonstrate a material change in
employment terms or conditions.").

constitute an adverse employment decision." Skehan, 465 F.3d at
106.  The alleged act of retaliation, however, must be "more
than de minimis." Zelnik, 464 F.3d at 226.


     4. Causal Connection Between Speech and Adverse Employment
Action

     For a First Amendment retaliation claim, "the causal
connection must be sufficient to warrant the inference that the
protected speech was a substantial motivating factor in the
adverse employment action." Cotarelo v. Village of Sleepy
Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir. 2006) (citation
omitted); see also Skehan, 465 F.3d at 106; Morris v. Lindau,
196 F.3d 102, 110 (2d Cir. 1999).  Even if the plaintiff
demonstrates such a causal connection, however, "the defendant
can still prevail on a motion for summary judgment if it can
show that it would have taken the same adverse employment action
even in the absence of the protected conduct.'" Cotarelo, 460
F.3d at 251-52 (citing Mount Healthy City Sch. Dist. Bd. of
Educ. v. Doyle, 429 U.S. 274, 287 (1977)); see also Skehan, 465
F.3d at 106.[14]  "This principle prevents an employee who engages

---

[14] The defendants can also prevail if they show that "the
plaintiff's expression was likely to disrupt the government's
activities and that the harm caused by the disruption outweighs
the value of the plaintiff's expression." Skehan, 465 F.3d at
106 (citation omitted).  The defendants in this case do not
argue for summary judgment on this ground.

in unprotected conduct from escaping discipline for that conduct
by the fact that it was related to protected conduct." Heil v.
Santoro, 147 F.3d 103, 110 (2d Cir. 1998).

"A plaintiff can establish the causal connection between
protected expression and an adverse employment determination
indirectly by showing that the protected activity was followed
by adverse treatment in employment, or directly by evidence of
retaliatory animus." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir.
2004) (citation omitted).  The Second Circuit "has not drawn a
bright line to define the outer limits beyond which a temporal
relationship is too attenuated to establish a causal
relationship between the exercise of a federal constitutional
right and an allegedly retaliatory action." Gorman-Bakos v.
Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554
(2d Cir. 2001).  In the context of a plaintiff's burden to make
out a prima facie case of causation in a claim for retaliation
under Title VII, however, the Supreme Court has noted that "the
temporal proximity must be very close." Clark County School
Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam)
(citation omitted).

"[I]f there are significant questions as to whether an
employer would have discharged an employee but for his/her
speech, summary judgment is precluded." Hale v. Mann, 219 F.3d

61, 70 (2d Cir. 2000).  Nevertheless, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary."  Cobb, 363 F.3d at 108 (citation omitted).

In the context of a claim of retaliation under Title VII, which requires the plaintiff in the first step of a burden-shifting framework to set forth a prima facie case of retaliation by showing that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer," Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) (citation omitted), nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity" to satisfy the knowledge requirement of the second prong.  Id.  As for the fourth prong, the causation element, however, "[t]he lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."  Id. at 117.  If the agent denies direct knowledge, however, a

jury could find retaliation if, <u>inter alia</u>, "the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge" or there are other circumstances evidencing knowledge.  <u>Id.</u>  Thus, in light of <u>Gordon</u>, "district courts have consistently held that, with regard to the causation prong of the prima facie standard, absent any evidence to support an inference that the decisionmakers knew of plaintiffs complaints, plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation."  <u>Murray v. Visiting Nurse Servs. of NY</u>, 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007).


B.  <u>The Plaintiffs' Retaliation Claims</u>

<u>Reape</u>

Applying these standards to Reape's episodes of speech, she has failed to raise a genuine issue of material fact as to whether her speech was made as a citizen and on a matter of public concern, and thus her First Amendment retaliation claim must be dismissed.  Reape's claim that she was retaliated against is based on the following speech: 1) her verbal complaints to her supervisors about her lack of training to work in the PHL, 2) her August 2007 writing to her supervisor on the same subject (no record of which was provided in connection with

this motion), and 3) her September 2007 request for a transfer
for "several reasons 1 being healthwise [sic]."

The first two episodes of speech, pertaining to a perceived
lack of training, is the type of speech Garcetti counsels is
made as an employee pursuant to her official duties, and not as
a citizen.  For one, the speech was made to supervisors, as
opposed to the general public.  Secondly, it concerned Reape's
ability (or inability) to carry out her job duties as directed,
which is the kind of speech made pursuant to her employment
duties and not as a citizen.  Similar circumstances were
addressed in Mulcahey v. Mulrenan, No. 06 Civ. 4371(LBS), 2008
WL 110949 (S.D.N.Y. Jan. 3, 2008), aff'd, No. 08-0594-cv, 2009
WL 835939 (2d Cir. Mar. 31, 2009) (summary order), in which a
fire captain had written a memorandum requesting an exemption
from his duty to serve as an acting battalion chief, because his
lack of training for that job made him unwilling to "accept any
responsibility for actions or decisions that may cause injury or
death to civilians or members of this department."  Id. at *2
(citation omitted).  The court found that "plaintiff's speech is
not entitled to First Amendment protection because it dealt with
his ability to perform his official duties."  Id. at *6.

In the instant case, Reape's speech concerning her training
was made to her supervisors in her professional capacity and in
regard to her official duties.  The fact the Notice of

Examination for the S.O. position did not refer to the specific requirements of the PHL post is not dispositive as to the scope of Reape's official duties.  It is undisputed that being stationed at the PHL was a common post for SOs, and thus Reape's communications to her supervisors regarding lack of training for that post were made pursuant to her official duties.

Reape's third episode of speech, her request for a transfer for "several reasons 1 being healthwise," also cannot support a First Amendment retaliation claim, because it does not touch upon a matter of public concern.  Looking at the content, form, and context of this request for a transfer and given the record as a whole, it cannot be said that this request is a matter of political, social, or other concern to the public.  Rather, it is simply an employee's personal request for a transfer, made for several unspecified reasons, one being the employee's personal heath situation.  Thus, Reape has not raised any genuine issue of material fact and her First Amendment retaliation claim must fail.

Finally, even assuming _arguendo_ that Reape's speech regarding lack of training could be seen as being made as a citizen on a matter of public concern, Reape has not raised an issue of material fact that there was a causal connection between these instances of speech and the termination of her employment.  Reape's speech on this issue occurred in August and

September 2007, and she was not fired until March 2008.  In between those dates, in October 2007, Reape was bitten by an insect and took a medical leave from which she did not return, despite the fact that she had been scheduled to return in February 2008.  Given the lack of close temporal proximity between her speech and her discharge, and the intervening events regarding her personal medical situation and medical leave from work, Reape has not raised an issue of fact that her speech regarding lack of training was a substantial or motivating factor in her dismissal.  This conclusion is bolstered by the fact that Reape was advised of the termination of her employment by McIntyre in the DOHMH Human Resources Department, following communications between that office and Reape regarding her medical leave situation, and it is undisputed that at the time McIntyre advised Reape of her discharge, McIntyre was not aware that Reape had made any allegations of lack of training.  Nor is there any allegation or evidence that McIntyre's superiors had any awareness of these complaints.  Reape's conclusory and unsupported allegations that she was fired due to her complaints about her lack of training are insufficient to raise a genuine issue of material fact that there was any causal connection between her dismissal following her failure to return from medical leave and her communications regarding her training.

Halloway

Halloway's claim that she was retaliated against is based on the following speech: 1) her September 2003 memorandum to Terlonge, requesting air testing due to the autoclave process and elevator shaft construction work, 2) a February 2005 Incident Report filled out by Halloway's supervisor reporting that Halloway felt nauseous and that there was a strong odor, and that the supervisor and another officer (not Halloway) observed the smell coming from six red "hazardous" bins, and 3) the April 2005 memorandum written to union delegate Soto and signed by several SOs, including Halloway, that complained of exposure to chemical exhaust from the autoclaves.

The February 2005 incident report cannot support a claim of retaliation for several reasons.  For one, it is not Halloway's speech, as it was her supervisor's report stating that Halloway felt dizzy and nauseas, and it was her supervisor that reported that he thought the smell was coming from a certain place. Second, even if it could be argued that Halloway adopted this speech, the report was a "Health Police Crime and Incident Report" that was clearly prepared in the course of the supervisor's official duties to report crimes and incidents, and was not private speech.  Under Garcetti, the filling out of an incident report pursuant to one's official duties cannot be the basis for a first amendment retaliation claim.

Halloway's other two episodes of speech both concern complaints regarding the autoclave process, and her concerns that she was being exposed to harmful chemical pollutants. These complaints were made not only to her supervisor, but to the director of the BPHL's health and safety unit and to her union representative.  Thus, unlike the complaints to a supervisor regarding lack of training for a particular official job duty, here there is less indication that these episodes of speech were made pursuant to Holloway's official duties.  Thus, the next inquiry is whether this speech touched upon a matter of public concern.

Defendants argue that the complaints regarding the autoclaves were made to address only personal employee grievances and not any broader purpose.  In support of this argument, they note that the autoclaves were not in an area to which the public had access, and that the SOs were the only ones affected.  The fact that the public does not have access to an area, however, does not mean that allegations of potential health and safety violations affecting city employees is not a matter of political, social, or other concern to the community.

Instead, plaintiff's allegations are similar to those in Munafo, where the plaintiff alleged "inter alia, trackworkers' being forced to operate in unlawful proximity to live rails without protective gear."  Munafo, 285 F.3d at 211-12.  There is

no indication that the public had access to the area with live rails, and yet the court firmly rejected as bordering on frivolous the idea that the plaintiff's safety complaints "were no more than internal personnel grievances relating to matters of his own personal interest."  Id. at 211.  Like the plaintiff in Munafo, Halloway's allegations of hazardous fumes making employees nauseous and causing breathing problems raise potential safety issues that are of public concern.

And unlike the plaintiff in Ezekwo, whose complaints concerned her own individual development, Ruotolo, 514 F.3d at 190, the primary aim of plaintiff's complaints is to address an environmental safety condition affecting city employees.  The mere fact that plaintiff is one such affected employee does not convert these complaints into a personal employee grievance devoid of a broader public purpose.  It would be a bizarre result to preclude a First Amendment retaliation claim based on allegations of health and safety concerns because the person complaining was also affected by the dangerous condition.

While two episodes of Halloway's speech were made as a citizen on an issue of public concern, however, Halloway has not raised an issue of material fact as to whether she suffered an adverse employment action or there was any causal connection between her speech and any such action.  Halloway's claimed adverse employment action was the denial of a requested

35

transfer.  It is undisputed, however, that Halloway made such a request in 2004 (after her memorandum to Terlonge but before signing the memorandum to Soto), and that she was offered a transfer but declined it.  It is further undisputed that she made no further requests for a transfer.[15]  In addition, Halloway was transferred from the PHL in 2007 due to an incident involving her arrest of a PHL employee, and Halloway remains employed by DOHMH.  On these facts, Holloway has not identified a genuine issue of material fact that she was subject to any action by the defendants that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,"  Zelnik, 464 F.3d at 225 (2d Cir. 2006) (citation omitted), when she was offered the relief she sought and declined it for personal reasons.  Thus, Halloway's First Amendment retaliation claim must fail.


Gangadeen

     The episodes of speech on which Gangadeen bases his First Amendment retaliation claim are: 1) signing the April 2005 letter to Soto regarding the autoclave-related conditions, 2)

---

[15] While Halloway's declaration asserts that her "numerous" requests for a transfer were denied, she does not identify the dates or recipients of the requests.  More significantly, she has not opposed the defendants' 56.1 statement that Halloway made no further requests for a transfer after she declined the 2004 reassignment offer.

the August 2005 letter to Senator Clinton, 3) a January 2007 written complaint to Breuers regarding intake procedures, which Gangadeen has briefly described but not submitted in opposition to this motion, 4) the April 19, 2007 email to Beatrice regarding the intake procedures, 5) the May 8, 2007 email to Frieden stating that there had been "breach of protocol procedures receiving negative results[, m]any of which are a hazard and in violation to the CFR," and that he had received verbal threats from his superiors, 6) the June 26, 2007 email to Breuers regarding the February 2006 anthrax incident, and 7) a July 6, 2007 written complaint (unspecified if by email or letter) to Breuers regarding unspecified health and safety violations.[16]  Gangadeen has not provided copies of either the June 26 or July 6, 2007 communications.  Gangadeen asserts that due to this speech, he suffered the adverse employment action of facing disciplinary charges.  These charges culminated in his December 13, 2007 resignation, which he asserts he undertook after being told that he would be fired.

Gangadeen has failed to provide more than "conclusory assertions of retaliatory motive to satisfy the causal link"

---

[16] There are also emails in the record from January and February 2007 between Gangadeen and Breuers which principally concern the subject of a hazardous duty pay enhancement.  Gangadeen does not point to these emails in support of his First Amendment retaliation claim, and upon review they do not assist his First Amendment claim.

between any protected speech and his asserted adverse employment action, and therefore his First Amendment retaliation claim must fail.  <u>Cobb</u>, 363 F.3d at 108 (citation omitted).  Gangadeen's argument that there was a causal connection relies solely on temporal proximity between his speech and the disciplinary charges.  The episodes of speech from April and August 2005, however, even if it is assumed that they were on matters of public concern, are simply too remote in time from the July 9, 2007 Notice and Statement of Charges that began the disciplinary process to establish a causal connection.  While the Second Circuit has not established a bright-line rule, two years is simply too attenuated to supply the required causal connection.  In addition, Gangadeen has not alleged or pointed to any evidence showing that anyone at DOHMH knew about his letter to his senator.

The conclusion that Gangadeen has failed to raise a question of fact that his 2005 complaints prompted the 2007 disciplinary proceedings is reinforced by the other disciplinary charges made against Gangadeen in the interim, which he has not argued had anything to do with any protected speech.  In May 2006, Gangadeen was suspended for conduct including threatening a supervisor over a parking space and repeatedly cursing at him, and it was recommended then by the ELU that he be fired.  He was able to avoid discharge when he agreed to a 30-day suspension

38

without pay and a year of probation.  Having not made any allegations that this charge or suspension was related to his protected speech, there is no genuine issue of material fact as to whether there was any casual connection between his later 2007 disciplinary charges and his 2005 protected speech, or as to whether Gangadeen's employment would have been terminated even absent his protected conduct.

Likewise, the two instances in which Gangadeen states that he emailed or wrote to Breuers in late June and early July do not raise a genuine issue of material fact that the disciplinary charges filed against him were prompted by these communications. Neither of these writings are in the record, nor has Gangadeen gone into any detail in explaining the nature of the writings in his declaration in opposition to the instant motion.  He states that the June 26, 2007 email was regarding health and safety violations including the "very threatening and scary breach" regarding the anthrax incident that had happened over a year earlier in February 2006, and that the July 6, 2007 email simply "reiterate[d] the health and safety violations."  Without a fuller description of these instances of speech, it is difficult to evaluate whether they were made by Gangadeen as a citizen on a matter of public concern.  Even assuming this speech is protected, however, Gangadeen has again failed to raise an issue

of material fact as to the causal relationship between the proffered speech and the disciplinary charges filed against him.

For one, the June 26 and July 6 writings to Breuers were both made after the investigation was initiated in May, and after June 1, which is when Gangadeen states that he learned that charges would be filed against him.  Given that these instances of speech were made after the investigation began, and given that Gangadeen does not dispute that he had possessed and sent the sensitive materials the DOI investigation uncovered, no rational juror could find that they were a substantial or motivating factor leading to the adverse action.  Cf. Clark County School Dist., 532 U.S. at 272 (noting that "[e]mployers need not suspend previously planned transfers upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

The remaining three instances of allegedly protected speech also fail to create a violation of Gangadeen's First Amendment rights even though they are close in time to the initiation of the DOI investigation.  Since Gangadeen has not provided a copy of the January 2007 written complaint to Breuers and has only described it as a statement that involved "breaches of federal protocol procedures with respect to the intake of biohazardous material," it is difficult to assess whether it constituted

protected speech.  His April 2007 email to Beatrice concerned
issues with the laboratory's intake procedures, but the only
evidence in the record shows that Beatrice, who was not
Gangadeen's supervisor, responded positively to Gangadeen's
suggestions by having Dr. Silletti look into them, and that Dr.
Silletti's email to Gangadeen concurred with most if not all of
Gangadeen's requested suggestions and suggested steps to
implement those suggestions.  But see Gorman-Bakos, 252 F.3d at
555-56 ("[D]efendants' allegedly positive response to
plaintiffs' call for changes in the 4-H program does not defeat
plaintiffs' opposition to the motion for summary judgment.  It
is possible, in light of the evidence offered, that defendants
recognized that plaintiffs had identified areas in which the 4-H
program might improve, yet at the same time sought to expel
plaintiffs from participation in the 4-H program because of the
challenges with which they presented defendants.").  More
importantly, it is also undisputed that Beatrice did not speak
to any of Gangadeen's supervisors regarding disciplining him for
this communication or regarding taking any action related to his
employment because of this email.  The final communication is
the May 2007 email to Frieden, the Commissioner of the DOHMH.

Even if it is assumed that all three of these statements
were written by Gangadeen as a citizen on a matter of public
concern, Gangadeen has not raised an issue of fact that either

singly or together they played any role in the filing of
disciplinary charges against him.  He has not offered any
evidence that these communications had anything to do with the
DOI investigation or the decision to file disciplinary charges
against Gangadeen.

First, the speech was made to Breuers, Beatrice, and
Commissioner Frieden, but Gangadeen has not pointed to a single
piece of evidence showing that these individuals were involved
in the decision to file the disciplinary charges against
Gangadeen.  Rather, the charges were filed by the ELU, on a
recommendation from the DOI investigator.  Thus, despite the
close proximity in time between these communications and the
disciplinary charges, no reasonable juror could find the
communications were a substantial or motivating factor in the
filing of disciplinary charges against Gangadeen.

More fundamentally, Gangadeen has not raised a genuine
issue of material fact on the issue of whether DOHMH would have
fired him even absent his speech.  The record shows that the
disciplinary charges he faced were precipitated by events that
did not involve any of his asserted protected speech.  Rather,
the record shows that on May 14, 2007, Breuers received a
threatening email from an unknown source.  Breuers reported the
email to the DOI, and an investigation commenced.  In the course
of investigating this email, the computer data for a DOHMH

police officer was accessed (who admitted to Gangadeen that he had sent the threatening email), and over 70 photograph images taken by Gangadeen of the PHL that Gangadeen had sent this police officer were uncovered.  Gangadeen admitted to the DOI under oath that he had taken and sent sensitive and unauthorized pictures.  The DOI investigator then referred the matter to the ELU for potential disciplinary charges.  The ELU sent Gangadeen of Notice of Charges On July 9, 2007, that informed him that he had broken certain rules of conduct by taking these pictures and emailing them using his employee account and computer, and that he had violated a rule of conduct due to his unauthorized absences and tardiness.  After an August 2007 informal conference on these charges, the conference leader recommended termination of Gangadeen's employment.

Gangadeen has not raised a material issue of fact with regard to any part of this chronology, which shows that the charges were precipitated not by any instances of Gangadeen's speech, but by an investigation into a threat that unexpectedly revealed Gangadeen's conduct in taking certain pictures of sensitive areas.  This chronology also does not involve any of the people that Gangadeen directed his speech towards, save for Breuers having forwarded the initial anonymous threatening email to DOI for investigation.  Because the record shows that the conduct uncovered in this DOI investigation led directly to the

disciplinary charges against Gangadeen, he has not raised a genuine issue of material fact challenging the defendants' showing that he would have faced these charges in the absence of his allegedly protected speech.

The fact that Gangadeen asserts that the conduct that was the basis for some of the disciplinary charges, the taking of photographs in the PHL, was related to the subject matter of some of his speech does not alter this conclusion.  As the Second Circuit has said, the principle that the employer can prevail on summary judgment if it shows that it would have taken the same adverse action even in the absence of the protected speech "prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct."  Heil v. Santoro, 147 F.3d at 110.

Gangadeen argues that he was treated more harshly because of his protected speech.  He points to another officer who was issued two summonses for graffiti violations but is still employed with DOHMH.  This is not sufficiently comparable to Gangadeen's situation to raise an inference that Gangadeen would not have faced disciplinary charges in the absence of his speech.  Plaintiffs have provided no evidence about the context for these graffiti violations or that particular officer's employment history.  The record does reflect, however, that even

prior to the disciplinary charges related to the photographs, Gangadeen had been the subject of disciplinary charges relating to his threatening and cursing at his supervisor that were serious enough to have resulted in the Informal Conference leader's recommendation in 2006 that Gangadeen be fired.  And of course, Gangadeen has offered no evidence to suggest that a graffiti offense is as serious as the taking and transmission of photographs of highly sensitive work areas.

Finally, Gangadeen tries to cast doubt on the legitimacy of the disciplinary process that resulted in his termination.  He states that he was never made aware of any law, rule, or regulation prohibiting the taking of pictures in the PHL.  The Notice of Charges sent to him, however, specified that he had violated Standard of Conduct Rule 3.25, "Conduct prejudicial to good order and discipline," and it stated that "[a]s a Special Officer assigned to the [PHL], you are aware that any form of recording, including video or photography, is prohibited inside the facility" and that "it is part of your duties as a [SO] to prevent any individual attempting to make such a recording of the facility or items contained therein."  The fact that Breuers testified that he had seen pictures taken by cell phones or handheld devices "at the Department of Health," that Gangadeen states that he had seen others taking pictures and there were "never any issues," and that Beatrice stated that she did not

45

know of a "written policy" prohibiting the taking of pictures in the First Avenue building, do not raise a genuine issue of material fact that Gangadeen was given notice of the basis of the disciplinary charge filed against him and indeed was aware before that time that his conduct was improper.  The DOI report stated that Gangadeen had admitted in his interview that the pictures he took were sensitive and unauthorized, and his Notice of Charges confirmed that assessment.  Gangadeen has therefore failed to raise a genuine issue of material fact that his speech was a substantial factor in his facing disciplinary charges or that he would not have faced such charges in the absence of his speech.  As such, Gangadeen's First Amendment retaliation claim must fail.[17]


CONCLUSION

Defendants' May 19, 2009 motion for summary judgment is granted as to plaintiffs' First Amendment retaliation claims.

---

[17] Because plaintiffs' First Amendment retaliation claims fail, plaintiffs' claims for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978), fail as well.  See, e.g., Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").

The federal claims having been dismissed, this Court declines to exercise jurisdiction over the plaintiffs' remaining state law claims, which are dismissed without prejudice.  The Clerk of Court shall enter judgment for the defendants on the First Amendment claims and close the case.


        SO ORDERED:

Dated:    New York, New York
          August 12, 2009

                              _____
                                  DENISE COTE
                              United States District Judge